UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:07-HC-2125-D

|  |  |
|---|---|
| UNITED STATES OF AMERICA | RESPONDENT'S PROPOSED |
| v. | FINDINGS OF FACT AND |
| STANLEY BURKHARDT | CONCLUSIONS OF LAW |

Comes now the Respondent, Stanley Burkhardt, by and through undersigned counsel, and respectfully requests that the Court enter the following findings of fact and conclusions of law in this matter, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I.    INTRODUCTION

Petitioner, the United States of America ("the government") instituted this civil action on July 6, 2007, seeking to commit Stanley Burkhardt ("Mr. Burkhardt" or "Respondent") as a sexually dangerous person pursuant to the Adam Walsh Child Protection and Safety Act of 2006 ("the Act").  18 U.S.C. § 4248. [Docket Entry ("DE") 1.]  The Government filed a certificate stating that mental health personnel for the Federal Bureau of Prisons ("BOP") examined Respondent and issued a preliminary determination that he is sexually dangerous within the meaning of the Act.  A certificate filed under the Act stays Respondent's release from federal custody pending a hearing to determine whether Respondent qualifies for commitment as a sexually dangerous person.  The government's petition was filed four (4) day prior to respondent's scheduled date of release from the BOP custody on July 9, 2007. [*See id.*]

1

An evidentiary hearing and bench trial is scheduled in this case before the Honorable District Judge Bernard A. Friedman during the November 28 – December 11, 2011 term.  On September 28, 2011 the Court directed the parties to file proposed findings of fact and conclusions of law no later than the beginning of the hearing.  After considering the testimony at the evidentiary hearing, the evidentiary record, and the parties' submissions, this Court concludes that although the government has met its burden to demonstrate that Respondent has committed acts of child molestation and suffers from pedophilia, the government has failed to establish by clear and convincing evidence that Respondent is sexually dangerous to others as required by the Act and the Constitution.  Respondent's pattern of offending has de-escalated over time from contact offenses to pornography offenses only; moreover, his pattern of offending can be significantly reduced by the fact that he will be barred from obtaining positions that would allow him to interact with children. Additionally, Mr. Burkhardt's age, his low actuarial scores, his exemplary work performance in prison, his demonstrated and deepened acceptance of responsibility, and the solid support of his brother all weigh against commitment in this case.

## II.    FACTS

1.  Stanley Burkhardt was born in 1951 and was sixty (60) years of age at the time of his evidentiary hearing.

2.  At the time of his hearing, Mr. Burkhardt had been incarcerated for more than four (4) years after his release date.

3.  Mr. Burkhard't's release date from the BOP was July 9, 2007. [DE 1 .]

### A.    Personal History

2

4. Mr. Burkhardt was born into an intact family and has three siblings. (Resp't Ex. 2 at 2.)  He was born and raised in New Orleans, Louisiana and reports no history of physical or sexual abuse as a child.  (*Id.*)  Mr. Burkhardt graduated from high school and began working for the New Orleans Police Department as a communications clerk.  (*Id.* at 3.)  Approximately a year later, he attended the police academy and then served as a police officer for the city of New Orleans from 1972 until 1987.  (*Id.*)  He served as a patrol officer, was promoted to a detective, worked in various sex crime units as well as serving as the lead detective in a newly created pedophile unit.  (*Id.*)  He was ultimately removed from the pedophile unit.  (*Id.*)  The reason for the removal is not clear.  Some records suggest he was removed following allegations that he victimized a child.  (*Id.*) Other records indicate that he was removed from the pedophile unit for falsifying a police report, using excessive force, and investigation of a murder.  (*Id.*)

5. Mr. Burkhardt married in 1981 and lived with his wife until 1985.  (*Id.*)  They were divorced in 1987, during Mr. Burkhardt's first period of incarceration.  (*Id.*)  No children were born of the marriage, but Mr. Burkhardt and his wife fostered six (6) children and were in the process of adopting one of the boys they had fostered since infancy when Mr. Burkhardt was arrested.  (*Id.*)

6. After release from prison in late 1992, Mr. Burkhardt held a series of jobs that included door-to-door collection of data for the city directory, driving a truck, and selling commericial fixtures.  (*Id.*)  From 1997 until his arrest in April 1998, he received workers compensation for a back injury.  (*Id.*)  Mr. Burkhardt currently works at FCI Butner as a law clerk forty (40) hours per week.  (*Id.* at 4.)  He has always held a job while incarcerated and received positive job reports. (*Id.*)

7. Mr. Burkhardt has never been diagnosed with alcohol or drug abuse. (*Id.*)

**B.** **Criminal and Sexual Offense History**

8. Mr. Burkhardt has no arrests or convictions for any nonsexual crimes. (Pet'r Ex.16.)

9. In 1987, Mr. Burkhardt was charged in a fifteen-count indictment in the United States District Court for the Eastern District of Louisiana, with sending and receiving child pornography, in violation of 18 U.S.C. §§ 2252(a)(1) and 2252(a)(2). (Pet'r Ex. 20.) He pleaded guilty to five counts of mailing and receipt of material involving sexual exploitations of minors and was initially sentenced to a term of imprisonment of fifty years. (Pet'r Ex. 22.) His sentence was subsequently reduced to thirty years of imprisonment, and reduced again to a term of ten years. (Pet'r Ex. 23.)

10. While in prison for the pornography conviction, Mr. Burkhardt confessed to his wife that he had molested his niece. As a result of his confession, he was convicted of his only contact sex offense, Aggravated Crime Against Nature, for having oral sex with his wife's niece in 1992. (Pet'r Ex. 25 & 16.)

11. In 1998, Mr. Burkhardt pleaded guilty before the United States District Court for the Eastern District of Louisiana to receipt of material involving sexual exploitation of a minor in violation of 18 U.S.C. § 2252(a)(2) and possession of material involving sexual exploitation of a minor in violation of 18 U.S.C. § 2252(A)(5)(B). (Pet'r Ex. 15 & 16.) He was sentenced to a nine-year term of imprisonment followed by a four-year term of supervised release. (*Id.*) Mr. Burkhardt was incarcerated in the BOP until his release in April 2006.

12. In April 2006, Mr. Burkhardt was released from the BOP to his term of supervised release. (Pet'r Ex. 13.) His supervision was revoked on July 26, 2006 for violations of the

4

program rules, inappropriate behavior with female clients, being defiant with staff, and failure to complete chores at the community correction's placement. He was sentenced to a period of 12 months on Counts 1 and 2, to run concurrently, followed by a four year term of supervised release. (Pet'r Ex. 11.)

### C. Bureau of Prisons Disciplinary History

13. Mr. Burkhardt has only one BOP disciplinary infraction. (Resp't Ex. 2.) On July 16, 2008, while in custody in the Maryland Unit at the BOP facility in Butner, he was instructed by BOP staff that he was not permitted in the commissary until he secured a new identity card. (*Id.*) Mr. Burkhardt became angry about losing his right to commissary. (*Id.*) He was cited and found guilty of refusing to obey an order and being insolent to staff members. (*Id.*) He was sanctioned by a thirty-day loss of visitation and phone privileges. (*Id.*)

14. In 2006, pictures of boys cut out of magazines and an article from NAMBLA (North American Man Boy Love Association) were found in Mr. Burkhardt's cell. Mr. Burkhardt denied that this material belonged to him. (Resp't Ex. 2 at 8.) He was charged but found not guilty of an institutional infraction.

### D. Sex Offender Treatment

15. In September 1990, Mr. Burkhardt was admitted to the Sex Offender Treatment Program ("SOTP") at FCI-Butner. (Pet'r Ex. 36 at 1565.) On February 7, 1992, he was terminated from SOTP for refusal to participate in the Behavioral Arousal Group, failure to adequately perform program behavioral techniques, and refusal to employ the correct instructions for the plethysmograph evaluation. (*Id.* at 1461.) During his seventeen months of treatment, Mr. Burkhardt participated in a variety of groups to address his sexual deviancy: core

group which focuses on the offenders sexual offenses and to assist them in recognizing the extent of the deviancy; the victim empathy group; a social skills group; a cognitive distortions group; anger management; and arousal disorder group. (*Id.* at 1568-70.) When asked to disclose his victims during the core group process of treatment, Mr. Burkhardt wrote that he had "12?" victims, and he discussed how he manipulated them into the molestations. (*Id.*) An SOTP sex offender treatment specialist opined in June 1992 that "overall Mr. Burkhardt did make some positive gains in the program, but due to his resistence to certain parts of the program he did not receive the full benefit of the program." (*Id.* at 1571.) The SOTP specialist also opined that he was still in need of extensive therapy as he has a lengthy history of pedophilia and uses spirituality to avoid looking at his sexual deviant behavior. (*Id.* at 1570.)

16. As a condition of his probation and parole, Mr. Burkhardt attended a Masters and Johnson Sexual Compulsion Program directed by Scott Brothers. (Pet'r Ex. 16 at 69-70.) Dr. Brothers reported in a summary report dated August 31, 1995, that Mr. Burkhardt recognized the negative consequences to his victims, that Mr. Burkhardt reported masturbating to child fantasies, homosexual fantasies and adult females, and that he generally tried not to sexualize children because he knew it was unhealthy. (*Id.* at 70.)

17. From March 2, 1993 to April 25, 1995, Mr. Burkhardt was treated by Alicia Barahas, a social worker under contract with the federal probation office. (*Id.*) She worked with Mr. Burkhardt on his poor self esteem, depression, anxiety, and management of stress. (*Id.*)

**E.** **Current Status**

18. On July 6, 2007, the United States filed the instant action seeking to commit Mr. Burkhardt as a sexually dangerous person under the Adam Walsh Act, 18 U.S.C. § 4248. (Pet'r

Ex. 1.) Pursuant to the statute, the filing of this action stayed his release pending the outcome of the proceedings. Mr. Burkhardt completed his criminal sentence on July 9, 2007 and was scheduled to be released that day if the government had not filed the certification pursuant to § 4248. Respondent's § 4248 proceeding was stayed *ab initio* for almost three years while the appellate courts analyzed § 4248's constitutionality. Respondent's case was assigned to this Court on August 6, 2010. [DE 19.]

19. If released, Mr. Burkhardt will be on supervised release for a term of four years. (Pet'r Ex. 11.) The amended conditions of his supervised release include, among others, no unsupervised contact with anyone under the age of eighteen, employment restrictions to ensure no contact with children under the age of eighteen, registering as a sex offender, installation of monitoring equipment on his computers or other devices with online capabilities, periodic unannounced computer inspection and copying of files by his probation officer, prohibition against possession of any sexually explicit pictures, paraphernalia, magazines, video tapes, or similar materials, and reporting to a probation officer as required. (Resp't Ex. 11.)

## III.     EXPERT'S QUALIFICATIONS

20. The government retained Dr. Christopher North as an expert in the case. Dr. North reviewed Mr. Burkhardt's records and interviewed Mr. Burkhardt.

21. The government will also call Dr. M. Lela Demby as an expert in the case. Dr. Demby reviewed Mr. Burkhardt's records but did not conduct a current interview of Mr. Burkhardt.

22. Respondent retained Dr. Diane Lytton. Dr. Lytton reviewed Mr. Burkhardt's records and interviewed Mr. Burkhardt.

23. The parties did not challenge the qualifications of any of the above experts. The Court having reviewed the curriculum vitae of the experts, finds that each individual is qualified by education and experience to offer expert testimony in this matter.

## IV. LEGAL PRINCIPLES

### A. Section 4248 Violates Equal Protection[1]

24. As a preliminary matter, this Court finds that § 4248 deprives Respondent of equal protection of the law under the Fourteenth and Fifth Amendments because there is no rational basis for § 4248's differentiation between individuals in BOP custody and individuals in the general public. *Incorporated by reference, United States v. Timms*, 5:08-HC-01256-BO (Eastern District of North Carolina, filed July 1, 2011).

### B. Delay in the Proceedings Violated Respondent's Due Process Rights

25. This Court also finds that Respondent was deprived of his due process rights under the Fifth Amendment of the United States Constitution because the government failed to bring Respondent before the court for a civil commitment hearing within a reasonable time after they filed the petition seeking commitment pursuant to § 4248. *Id.*

### C. 18 U.S.C. § 4248 as applied to Respondent Constitutes Criminal Punishment

26. This Court finds that the conditions of Respondent's confinement constitute criminal punishment that violates the Double Jeopardy Clause, the Ex Post Facto Clause, the Eighth

---

[1] Mr. Burkhardt is aware that this Court has ruled in the government's favor with respect to the first three legal principles. However, because the Fourth Circuit and Supreme Court have not ruled on these matters, Mr. Burkhardt includes them in his proposed findings of fact and conclusions of law for preservation.

Amendment prohibition against cruel and unusual punishment, and the jury trial right contained in the Sixth Amendment.

### D. Standard of Proof and Elements Required to be Established

27. The government has the burden of proving each element by clear and convincing evidence. 18 U.S.C. § 4248(d). "[T]he individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity" that this standard is required not only by the Act, but by the Due Process clause of the Constitution." *Addington v. Texas*, 441 U.S. 418, 427 (1979). The clear and convincing evidence standard is an "intermediate standard," lying somewhere "between preponderance of the evidence and proof beyond a reasonable doubt." *Id.* at 425. "'Clear and convincing' has been defined as evidence of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established." *Jimenez v. DaimlerChrysler Corp.*, 269 F.3d 439, 450 (4th Cir. 2001) (internal quotations and citations omitted). It has alternatively been described "as meaning 'highly probable.'" *Direx Israel Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 810 n.7 (4th Cir. 1992) (quoting 9 J. Wigmore, Evidence § 2498 (3d ed. 1940)).

28. To commit Respondent, the government must prove by clear and convincing evidence that Respondent is a "sexually dangerous person," which the Act defines as "a person who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others." 18 U.S.C. § 4247(a)(5). An individual is "sexually dangerous to others" under the Act if he "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6).

9

29. This phrase has not been defined by the statute. The legislative history indicates that it is a direct legislative enactment of the principle of volitional impairment enunciated in *Kansas v. Hendricks*, 521 U.S. 346 (1997) and *Kansas v. Crane*, 534 U.S. 407 (2002). *See* H.R. Rep. No. 109-218(I) Section-by-Section Analysis and Discussion § 511. In *Crane*, the Supreme Court stated that the "serious difficulty" requirement is intended to distinguish the "dangerous sexual offender whose mental illness, mental abnormality or mental disorder subjects him to civil commitment, from the dangerous, but typical, recidivist convicted in an ordinary criminal case who, having been convicted and punished for one crime, proceeds through his own free choice to commit another." *Crane*, 413.

30. A finding of dangerousness is also constitutionally required. *Kansas v. Crane*, 534 U.S. 407-09, 410 (stating "we have consistently upheld involuntary commitment statutes . . . [when] (1) the confinement takes place pursuant to proper procedures and evidentiary standards; (2) there is a finding of 'dangerousness either to one's self or others,' and (3) proof of dangerousness is "coupled . . . with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality'" (*citing Kansas v. Hendricks*, 521 U.S. 346, 357-58; quotations omitted)). *See also Foucha v. Louisana*, 504 U.S. 71, 82-83 (1992).

31. The Court finds that in this regard, the statute and due process considerations require that, in addition to a volitional impairment, the government must prove by clear and convincing evidence that Respondent poses a risk of reoffense that is significant enough to justify a finding that Respondent is sexually dangerous and therefore can be preventively detained.

32. In this case the government has proven neither. The evidence in this case does not demonstrate that Respondent currently suffers from a volitional impairment. The evidence also

10

demonstrates that the recidivism rates proposed by the government's experts are likely overestimates. Further, even if this Court were to credit the government's experts regarding Respondent's likelihood of recidivism, the statistical evidence presented does not rise to the level of clear and convincing evidence of dangerousness sufficient to justify commitment.

## V. FINDINGS

### A. Prior Bad Acts

33. Mr. Burkhardt does not contest that he has engaged in child molestation in the past. This Court finds that the government has established this element by clear and convincing evidence.

### B. Suffers from a Serious Mental Illness, Abnormality or Disorder

34. All of the experts who have evaluated Mr. Burkhardt are in agreement on an Axis I diagnosis and all have diagnosed pedophilia, sexually attracted to males and females, non-exclusive type. There is disagreement as to additional diagnoses. Dr. North includes an additional Axis I diagnosis of Paraphilia, not otherwise specified (hebephilia).[2] (Pet'r Ex. 4, 48.)

---

[2] Hebephilia is not listed nor an accepted mental disorder in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* ("DSM"). Hebephilia has currently been proposed by to be included as a mental disorder in the revision of the DSM, however it has been rejected as a proper mental disorder by numerous psychologists including the Chairman and Editor of the DSM, Drs. Frances and First. Drs. Frances and First have opined that hebephilia is not a paraphilia because the sexual arousal pattern that would define it, attraction to pubescent children, is not inherently deviant. Allen Frances & Michael First, *Hebephilia Is Not a Mental Disroder in DSM-IV-TR and Should Not Become One in DSM-5,* 39 J. Am. Acad. Psychiatry Law 78-85 (2011). *See also* Karen Franklin, *Hebephilia: Quintessence of Diagnostic Pretextuality*, 28 Behav. Sci. & L. 751-68 (2010); *especially id.* at 764 (explaining that "hebephilia is being advanced as a mental disorder by a small cadre of government experts intent on legitimizing the indefinite detention of men who have committed culturally repugnant acts with minors and who do not meet the diagnostic criteria for other, more established disorders"); Richard Green, *Hebephilia is a Mental Disorder?*, 5(1) Sexual Offender Treatment 1 (2010) ("Diagnosing hebephilic behavior as a mental disorder brushes aside common patterns

11

Dr. Demby diagnosed two Axis II conditions, Narcissitic Personality Disorder and Personality Disorder Not otherwise specified with antisocial traits. (Pet'r Ex. 7.) Since there is no disagreement among the experts that Mr. Burkhardt suffers from pedophilia, and the Respondent does not contest that diagnosis, the Court does not need to address the applicability of the additional diagnoses and finds that the government has established this element by clear and convincing evidence that Mr. Burkhardt suffers from a serious mental illness, namely pedophilia.

### C. Serious Difficulty Refraining from Child Molestation

35. In order to commit Mr. Burkhardt, the government must prove that the disorder results in "serious difficulty refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6). As discussed previously, this term implies a volitional impairment.

36. The DSM-IV-TR is clear that the fact that someone has been diagnosed with a mental illness or disorder does not answer the question of whether that person's volition is impaired. The manual states:

> It is precisely because impairments, abilities and disabilities vary widely within each diagnostic category that assignment of a particular diagnosis does not imply a specific level of impairment or disability. The fact that an individual's presentation meets the criteria for DSM diagnoses does not carry any necessary implications regarding the individual's degree of control over the behaviors that may be associated with the disorder. Even when diminished control over one's behavior is a feature of the disorder, having the diagnosis in itself does not demonstrate that a particular individual is or was unable to control his or her behavior at a particular time.

DSM-IV-TR at xxxiii.

---

of psychosexual development, sidesteps cultural influences on sexuality, ignores historic precedents, insults much of Europe and elsewhere that legalizes sex with 14 year olds, or younger, and attempts to insulate psychiatry as an agent of social control.").

12

37. This Court finds that the government has not shown by clear and convincing evidence that Respondent currently presents a serious mental illness, abnormality or disorder that impairs his volitional control such that he would have serious difficulty refraining from sexually violent conduct or child molestation if released.

## VI. DANGEROUSNESS AND RISK ASSESSMENT

### A. <u>Introduction</u>

38. All of the experts in this case conducted a risk analysis based on empirical tools and actuarial instruments to evaluate, quantify, and support their dangerousness determination.

39. No psychological tests or actuarial instruments have been developed that predict with certainty an individual's risk of future sexual offending. The risk instruments are based on group data and provide risk estimates of defined sample groups to which an individual is compared. "The recidivism rates contained in the actuarial tables are the product of the amalgamated risk characteristics of the group and, therefore cannot be ascribed to a particular individual since the risk factors for the individual may vary substantially from that of the group." Theodore Donaldson and Brian Abbott, *Prediction in the Individual Case: An Explanation and Application of its Use with the Static-99R in Sexually Violent Predator Risk Assessments*, 29(1) American Journal of Forensic Psychology 7 (2011). The actuarial instruments provide only group prediction rates on risk of re-offending. The instruments do not provide individual rates of reoffending. *Id.*

40. In evaluating Mr. Burkhardt, all of the experts utilized a clinical analysis combined with actuarial instruments and psychological tests to determine if Mr. Burkhardt presents a serious risk of reoffending.

13

41. Three expert opinions were offered by the parties on the issue of whether Mr. Burkhardt meets the criteria for commitment pursuant to 18 U.S.C. § 4248. Dr. North and Dr. Demby, the government's experts, both opined that Mr. Burkhardt is a sexually dangerous person as defined by the Act. Dr. Lytton, the Respondent's expert, opined that Mr. Burkhardt is not a sexually dangerous person and is not at risk of reoffending if released.

42. For the reasons set forth below, the Court finds that the government has not established by clear and convincing evidence that Respondent suffers from a serious mental illness, abnormality or disorder that impairs his volitional control and would result in him having serious difficulty refraining from sexually violent conduct or child molestation.

## B. Expert Opinions

### 1. Dr. Christopher North

43. Dr. North authored two evaluation reports dated March 19, 2011 and October 10, 2011. (Pet'r Ex. 4, 48.) He opined, based on his examination of Mr. Burkhardt and review of his records, that Mr. Burkhardt meets the criteria as a sexually dangerous person as described in 18 U.S.C. § 4248. (*Id.*) His opinion appears to be based on both a clinical analysis of Mr. Burkhardt and an assessment of actuarial instruments. (*Id.*)

44. In his initial report, dated March 19, 2011, Dr. North opined, based on a record review only, that Mr. Burkhardt suffers from two serious mental disorders (pedophilia, hebephilia) that will cause him serious difficulty in refraining from child molestation if released to the community. (Pet'r Ex. 4.) Dr. North noted that:

> [A]lthough [Mr. Burkhardt's] risk of sexual reoffense tested as 'moderate' on the three actuarial instruments utilized in this risk assessment, it is this evaluator's opinion that given the material found in his cell in 2006 and his recent behavior while on parole Mr. Burkhardt's risk is high. Of particular concern are the

14

material from NAMBLA as this group endorses sexual activity between men and boys. He appears to be unwilling or unable to effectively manage his paraphilic interests and it is this evaluator's opinion that those interests will eventually lead him to molest another child.

(*Id.* at 2371.)

45. In reaching his March 2011 conclusion, Dr. North utilized several actuarial instruments and psychological tests. He used the Static-99 Revised, the Static-2002 Revised,[3] and

---

[3] In 1999, Dr. Karl Hanson, a statistical researcher with the Canadian Office of Public Safety, developed the Static-99, an actuarial instrument consisting of ten factors. The ten factors are: whether the offender is younger than 25 years old, whether the offender ever lived with a lover for at least two years, index non-sexual violence, prior non-sexual violence, number of prior sentencing dates, any unrelated victims, any stranger victims, and any male victims. The Static-99 scores the offender on a scale from 0 to 12. Each score is associated with a risk level (i.e. high, medium, low). Each score was also associated with a percentage of recidivism over 5 years, 10 years, and 15 years. Dr. Hanson derived the original recidivism percentages associated with each score on the Static-99 by retrospectively scoring the instrument on a group of 1,086 offenders released from incarceration in Canada and the United Kingdom between 1958 and 1993 with known 5, 10, and 15 year recidivism rates after release. The average age of these 1,086 individuals was 33.5 years old. The Static-99 has been revised and replaced by the 99-R and revised again in 2002. (Resp't Ex. 7 at 18.)

In the fall of 2008, the developers of the Static-99 issued new recidivism percentages associated with the different scores on the instrument. The prior recidivism percentages associated with the original Static-99 were derived from sex offenders released from 1958 to 1993, these newer recidivism percentages are based on contemporary samples of sex offenders who were released from incarceration in the 90s and after. The new recidivism percentages associate with the different scores on the Static-99 are substantially lower than the old recidivism percentages. (*Id.*) *See also* A. Harris et al., *Are New Norms Needed for the Static-99* (presented at the 27th Annual Research and Treatment Conference of the Association for the Treatment of Sexual Abusers, Atlanta, Georgia, Oct. 23, 2008).

the Minnesota Sex Offender Screening Tool-Revised (MnSOST-R) [4] actuarial instruments. All of the actuarial instruments placed Mr. Burkhardt in the moderate to low risk category.

46. Dr. North noted that these actuarial instruments have moderate predictive accuracy. (Pet'r Ex. 4 at 2357.) During his deposition, Dr. North testified that Mr. Burkhardt's Static-99R and Static-2002R scores would typically not meet commitment criteria. (Pet'r Ex. 5 at 57-58, 66.)

47. When quantifying recidivism rates for individuals who achieved the same score as Mr. Burkhardt on the Static-99R and the Static-2002R, Dr. North compared him to a group of offenders with the highest recidivism rates, the "high-risk/high-needs" group. (Pet'r Ex. 4 at 2361-65.) As noted in Dr. North's report, the Static-99R and Static-2002-R have multiple reference groups for comparison (routine correctional, non-routine correctional, pre-selected for treatment, preselected for risk/need) and evaluators are instructed to select and use the reference group(s) that best fit selection criteria of the individual being evaluated. (*Id.*) Dr. North did not compare Mr. Burkhardt's Static-99R or Static-2002R scores to any other sample groups when listing recidivism rates, noting that use of this sample group is most applicable to Mr. Burkhardt

---

[4] The MnSOST-R was developed by Epperson, Kaul and Huot in association with the Minnesota Department of Corrects in 1995 and subsequently revised. The development sample for the MnSOST-R was comprised of 256 sex offenders incarcerated in the state of Minnesota for felony sex offenses. The MnSOST-R is a sixteen question instrument comprised of twelve static factors and four dynamic factors. The score ranges from 16 to 31. Each score is associate with likelihood of re-arrest over a period of six years. Douglas Epperson et al., *Minnesota Sex Offender Screening Tool–Revised (MnSOST-R): Development, Validation, and Recommended Risk Level Cut Scores* (December 2003.) In January 2012, Minnesota will cease utilizing the MnSOST-R in favor of an improved actuarial tool. Grant Duwe, Director of Research and Evaluation, Minnesota Dep't of Corrections, The Minnesota Sex Offender Screening Tool-3, Presentation at the Conference for the Association for the Treatment of Sexual Abusers (Nov. 4, 2011).

given his significant unmet treatment needs and that he was selected for § 4248 commitment. (Pet'r Ex. 4 at 2364-65**;** Pet'r Ex. 5 at 59**.**)  Dr. North noted that individuals with the same scores on the Static-99R and Static-2002R as Mr. Burkhardt in the high-risk/high needs group recidivated at a rate of 16-20 % in five years and at a rate of 24-30 % in ten years on the Static-99R and at a rate of 19-24% in five years and at a rate of 28-34% in ten years on the Static-2002R.  (Pet'r Ex. 4 at 2369.)  He scored Mr. Burkhardt on the MnSOST-R as a 8-10, which associated him with a group of individuals thirty percent of whom had been arrested for reoffense after six years.  (*Id.*)  When deposed by the parties on August 29, 2011, Dr. North stated that he was not using the MnSOST-R as part of his risk assessment in this case.  (Pet'r Ex. 5 at 66-68.)

48.  On October 5, 2011, Dr. North conducted a clinical interview of Mr. Burkhardt. (Pet'r Ex. 48.)  He did not conduct any further psychological testing.  Following the interview Dr. North authored an additional report dated October 10, 2011 in which he opined that: "Despite the 'clarifications' regarding materials found in his cell in 2006 and his correspondence with other sex offenders while briefly on parole, it remains my opinion that he does meet the criteria as a sexually dangerous person." (*Id.* at 2484.)  Dr. North did not find Mr. Burkhardt's assertion of 75% attraction to adult females credible given his sexual history.  (*Id.*)  He opined that Mr. Burkhardt has had difficulty managing his pedophilic and hebephilic urges for years and had problems while on supervised release.  (*Id.*)  It remains his opinion that Mr. Burkhardt's mental disorder will result in serious difficulty refraining from child molestation if released.  (*Id.*)

### 2.    Dr. M. Lela Demby

49.  Dr. Demby, a psychologist employed by the BOP, opined based on her review of the records that he suffers from a serious mental illness, abnormality, or disorder, and as a result

would have serious difficulty in refraining from sexually violent conduct or child molestation. (Pet'r Ex. 7 at 2321.)  Dr. Demby diagnosed Mr. Burkhardt with pedophilia, nonexclusive type, narcissistic personality disorder, and personality disorder not otherwise specified with antisocial traits.  (Pet'r Ex 7 at 2312-14.)[5]

50.  In assessing Mr. Burkhardt's risk of recidivism Dr. Demby lists three actuarial instruments, the Static-99, the Static-99R, and the Rapid Risk Assessment for Sex Offense Recidivism (RRASOR), that she relied upon in her evaluation.  (Pet'r Ex. 7 at 2314-16.)  At her deposition, Dr. Demby noted that she no longer relies on the Static-99 because it has been replaced by the Static-99R nor does she continue to rely on the RRASOR.  (Pet'r Ex. 10 at 66.) She also amended the Static-99R to a total score of 3 to take into account that fact that he is now sixty years old.  Pet'r Ex. 10 at 68.  The amended Static-99R score places Mr. Burkhardt in the low-moderate risk category.  (*Id.* at 69.)  Dr. Demby was unable to provide risk percentages for individuals who scored 3 on the Static-99R during her deposition.  The risk percentages she utilized in her report would not be accurate because they pertain to an individual who scores 5 not 3 on the Static-99R.

51.  Lastly Dr. Demby utilized the Sexual Violence Risk-20 (SVR-20) in assessing dynamic factors related to Mr. Burkhardt's risk for future sexual violence.[6]  She opined after

---

[5] At her September 13, 2011 deposition, Dr. Demby testified that Mr. Burkhardt does not meet the full DSM-4 criteria for antisocial personality disorder and therefore she diagnosed him with personality disorder, not otherwise specified, and that his current behavior does not demonstrate that he suffers from a personality disorder.  (Pet'r Ex. 10 at 48.)

[6] The SVR-20, developed by Boer, Hart, Kropp and Webster in 1997, assesses sex offender recidivism risk by addressing twenty risk factors.  Terence W. Campbell, Assessing Sex Offenders 200. The test aids in rendering a clinical judgment.

18

discussing and rating Mr. Burkhardt on the twenty factors in the SVR-20 that his risk of future

sexual violence is high.  (*Id.*)

52.  Dr. Demby concluded in her report that "Mr. Burkhardt is a 59 year-old, life-long

pedophile and child abuser, whose past history and high scores on the Static-99R and SVR-20

indicate a very high probability that his past patterns of sexually abusing children will continue."

(Pet'r Ex. 7 at 2320.)  She went on to state that "cumulatively, his overall history, criminal record,

offense characteristics, lifestyle choices, personality patterns, sexual relapses, and treatment

failures indicate an extremely high risk of future sexual reoffense."  (*Id.*)  She testified in her

deposition that her opinion on Mr. Burkhardt's risk of reoffending was not altered by the fact that

his age lowered his Static-99R score.  (Pet'r Ex. 10 at 122-23.)  She opined that he has reoffended

while on supervision in the past and that unless the supervision is highly structured and life time

he remains at risk of reoffending if released.  (*Id.*)  She elaborated further and testified in her

deposition that the presence of his three diagnoses cause him to have difficulty refraining from

reoffending and that his personality disorder, not otherwise specified with antisocial personality

traits impairs him the most.  (*Id.* at 148.)

### 3. Dr. Diane Lytton

53.  Dr. Lytton evaluated the Respondent and opined based on her examination of Mr.

Burkhardt and review of his records that it was her opinion that Mr. Burkhardt has demonstrated

volitional control over his disorder (pedophilia), and therefore, "to a reasonable degree of

psychological certainty, he does not have a mental disorder that causes him serious difficulty in

refraining from sexually violent conduct or child molestation if released.  (Resp't Ex. 2 at 14.)

She further opined that "based on an analysis of research-supported risk factors and risk

19

instruments, he is low risk to reoffend" and does not meet the criteria for commitment under the sexually dangerous persons ("SDP") law. (*Id.*)

54. Dr. Lytton concurred with the diagnosis of pedophilia. (Resp't Ex. 2 at 10.) She disagreed with Dr. Demby's diagnosis of narcissistic personality disorder and personality disorder not otherwise specified with antisocial traits. (*Id.* at 11.) She noted that the diagnosis stemmed from a 1987 psychological assessment of Mr. Burkhardt by a predoctoral intern, based on tests but no behavioral observations. (*Id.*) She noted that research has shown that a personality disorder is not necessarily a life long disorder and tends to abate with age and that research has demonstrated that a diagnosis of personality disorder, not otherwise specified, is unreliable and has low validity. (*Id.* at 10-11.) Dr. Lytton concluded that Mr. Burkhardt does not meet the criteria for such a diagnosis and does not show dysfunction in his daily life and has demonstrated guilt and concern for his victims which is inconsistent with someone who has a narcissistic or antisocial personality disorder who would have no interest in his victims' reactions to his abuse. (*Id.*)

55. In assessing Mr. Burkhardt's risk of recidivism, Dr. Lytton used several actuarial instruments, namely the Static-99R and the Multisample Age Stratified Table of Sexual Recidivism Rate ("MATS-1").[7] (Resp't Ex. 2 at 12-13.) Dr. Lytton scored Mr. Burkhardt at a

---

[7] The MATS-1 is a recently developed actuarial instrument for estimating sexual recidivism risk that was derived from data for 9,305 sex offenders. The MATS-1 was complied from an age-stratified table for Static-99 and an age-stratified table from the Automated Sexual Recidivism Scale. The MATS-1 validates the "age invariance effect" that the risk of sexual recidivism declines with advancing age and shows that age-restricted tables understate risk for younger offenders and overestimate risk for older offenders. Richard Wollert et al., *Recent Research (N=9,305) Underscores the Importance of Using Age-Stratified Actuarial Tables in Sex Offender Risk, Assessments*, (22) Sexual Abuse: A Journal of Research and Treatment 472-90 (2010).

four on the Static-99R.  (*Id.*)  She noted that the estimated reoffense rate for the complete sample of subjects who scored a four on the Static-99R is 12% and the estimated rate of reoffense for the routine subsample of subjects who scored a four on the Static-99R is 6% after five years.  (*Id.* at 13.)  On the MATS-1, Dr. Lytton scored Mr. Burkhardt a five, which equates to a 6% estimated risk of reoffending in the development sample for persons sixty years old and older.  (*Id.*)

56.  Dr. Lytton also utilized the SVR-20 test in rendering her opinion on Mr. Burkhardt's likelihood of recidivism.  (*Id.* at 14.)  She noted that Mr. Burkhardt has four to five out of the twenty risk factors, which she determined corroborate the conclusion from the actuarial tests that he presents a low risk of sexually reoffending.  (*Id.*)

57.  In formulating her opinion regarding Mr. Burkhardt's risk of recidivism, Dr. Lytton took into account the fact that he appeared to have a relationship with all of his victims prior to any sexual interactions with them which would indicate he has self-control over his actions in that sexual contacts were not impulsive or always the primary goal of each interaction.  (*Id.* at 7.)  She also noted that Mr. Burkhardt has demonstrated a de-escalation in sexual offending.  He initially engaged in pornography and contact offenses and later reverted back to only pornography offenses.  His last allegation of a contact sexual offense was more than fourteen years ago.  (*Id.* at 9.)  It was her opinion his pattern of offending, always in the context of a relationship, can be managed with close supervision and restricted access to children.  (*Id.*)  Lastly, Dr. Lytton considered the fact that Mr. Burkhardt has not had any sexual misconduct while in the BOP.  (*Id.* at 10.)

## VII. CONCLUSIONS OF LAW

58.  The Court finds that § 4248 deprives Respondent of equal protection of the law under the Fourteenth and Fifth Amendments to the United States Constitution because there is no rational basis for § 4248's differentiation between individuals in BOP custody and individuals in the general public.

59.  The Court finds that Respondent was deprived of his due process rights under the Fifth Amendment of the United States Constitution because the government failed to bring Respondent before the Court for a civil commitment hearing within a reasonable time after they filed the petition seeking commitment pursuant to § 4248.

60.  The Court finds that the conditions of Respondent's confinement constitute criminal punishment that violates the Double Jeopardy Clause, the Ex Post Facto Clause, the Eighth Amendment prohibition against cruel and unusual punishment, and the jury trial right contained in the Sixth Amendment.

61.  The Court finds that Respondent has committed acts of child molestation in the past.

62.  The Court finds that Respondent meets the diagnostic criteria for pedophilia.

63.  The Court finds that pedophilia is a chronic disease but does not carry with it any necessary implications regarding level of volitional control.  The Court finds that the government has not proven by clear and convincing evidence that Respondent suffers from a volitional impairment such that he would have "serious difficulty refraining from sexually violent conduct of child molestation if released."

64.  The United States Supreme Court precedent makes clear that the "serious difficulty" language does not require total or complete lack of control, but does require that it must be difficult, if not impossible, for the person to control his dangerous behavior.  *See Kansas v. Crane*, 534 U.S. 407, 411 (2002) (citing *Kansas v. Hendricks*, 521 U.S. 346, 358 (1997)).  The conflicting evidence concerning the probability of Mr. Burkhardt's reoffending cannot support a finding that he would have "serious difficulty" in refraining from child molestation.

65.  The Court has been presented with three opinions about Respondent's risk of reoffense in the event he is released.  The Court has considered the information and finds this information relevant to its determination of Respondent's sexual dangerousness.  Having considered the reports, forensic evaluations, and testimony of the three experts in this case, the Court finds that the government has not proven dangerousness by clear and convincing evidence sufficient to justify commitment.

66.  The Court accords the opinion of Dr. Demby less weight than the other expert opinions.  She is the only psychologist to diagnose personality disorder not otherwise specified with antisocial traits. This additional diagnosis is not supported by the other psychologists and does not appear to be supported by Mr. Burkhardt's current behavior.  Moreover, she testified in her deposition that Mr. Burkhardt's personality disorder, which she alone diagnosed, was the most indicative of his lack of volitional control.  The Court also questions her opinion on his risk of recidivism because she listed actuarial instruments in her evaluation report which she relied upon in formulating her written opinion and then when subsequently deposed noted that she was no longer relying on two of the actuarial instruments.  She also testified in her deposition that her

original score on the Static-99R had to be reduced to account for Mr. Burkhardt's age, which would reduce the risk percentages but would not influence her opinion.

67. Dr. North concluded that Respondent poses a high risk of recidivism. In reaching his opinion he relied on his clinical judgment of Mr. Burkhardt and several actuarial instruments utilized to predict rates of recidivism for groups of sex offenders who achieve the same score as Mr. Burkhardt on the test. The Court notes that the actuarial instruments relied upon by Dr. North predict only a moderate rate of recidivism for a group of individuals who achieve the same score as Mr. Burkhardt. The tests cannot predict Mr. Burkhardt's individual rate of recidivism. The Court also notes that Dr. North limited his comparison to the high risk/high need sample group who have the highest recidivism rates for these actuarial instruments. More importantly, Dr. North stated the actuarial scores of Mr. Burkhardt would not generally meet the criteria for commitment. The Court finds a "moderate" risk is insufficient to justify commitment.

68. The Court also has concerns about Dr. North's assessment of Mr. Burkhardt's volitional control. When asked during his deposition about what could change his opinion with respect to Mr. Burkhardt's volitional control, Dr. North essentially conceded that there is nothing that Mr. Burkhardt could do while detained that would change his assessment. Dr. North stated that it would be unlikely for Mr. Burkhardt to reveal his sexual fantasies and interests while being evaluated for civil commitment. The most current behavioral information used by Dr. North in evaluating Mr. Burkhardt's volitional control dates back to April 2006 when he was found in possession of pornography and an article from NAMBLA while detained and his behavior while on supervision from April 2006 until July 2006. The Court notes that Mr. Burkhardt has had basically exemplary behavior while confined at FCI-Butner, having only one infraction and

24

excellent work reports.  Mr. Burkhardt, when interviewed by Dr. North, reported that he currently sexually fantasizes about adult women and can control his fantasy and interest in children; yet, Dr. North choose to ignore this information.

69.  The Court finds the opinion of Dr. Lytton to be the most well-reasoned and persuasive.  Dr. Lytton, like Dr. North, based her opinion on clinical judgment, actuarial instruments, and psychological tests.  The Court is persuaded that Dr. Lytton's method of synthesizing the available data and applying it to Mr. Burkhardt gives the Court a more accurate depiction of Mr. Burkhardt's risk of reoffending.   Dr. Lytton utilized the same actuarial instruments and psychological tests as Dr. North and Dr. Demby; however, she provided a more complete discussion of the tests' strengths and weaknesses.  For instance, she did not limit her analysis of the recidivism rates to only one sample group but provided recidivism rates for several sample groups.   She also used the most recently developed actuarial instrument, the MATS-1, which uses the same information as the Static-99R but quantifies the data in a more systematic manner to account for an individual's age.  Mr. Burkhardt is sixty years old—which all of the experts agree decreases his risk of reoffending.  Dr. Lytton's opinion is consistent with the actuarial instruments which produced a moderate to low rate of recidivism for individuals who score the same as Mr. Burkhardt on these tests.  Dr. Lytton also accords Mr. Burkhardt's recent behavior as indicative of volitional control.  Dr. North and Dr. Demby cite to behavior by Mr. Burkhardt in 2006-2007 as evidence that he does not have volitional control over his pedophilia.  The questions before this Court is whether Mr. Burkhardt is currently a serious risk of reoffending.  The Court finds Dr. Lytton's opinion on this issue to be the most informative,

supported by actuarial instruments and psychological tests and most persuasive on the issue before the Court.

## CONCLUSION

For the foregoing reasons, the Court should enter judgment in this matter that Stanley C. Burkhardt is not a "sexually dangerous person" and order his release from the custody of the federal Bureau of Prisons so that he may commence his term of supervised release.

Respectfully submitted this 7th day of December, 2011.

THOMAS P. MCNAMARA
Federal Public Defender

/s/ Suzanne Little
SUZANNE LITTLE
Assistant Federal Public Defender
E-mail: Suzanne_little@fd.org
VA State Bar No. 31344

/s/ Katherine E. Shea
KATHERINE E. SHEA
Assistant Federal Public Defender
E-mail: Kat_Shea@fd.org
Member of the New York State Bar

ATTORNEYS FOR RESPONDENT
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
Telephone: 919-856-4236; Fax: 919-856-4477
LR 57.1 Counsel, Appointed

26

*CERTIFICATE OF SERVICE*

I HEREBY CERTIFY that a copy of the foregoing was served upon:

**G. Norman Acker, III**              **Michael Bredenberg**
**R.A. Renfer, Jr.**                      **Michael E. Lockridge**
**Mike James**                           Bureau of Prisons, Legal Dept.
**Seth Morgan Wood**                P.O. Box 1600, Old Highway 75
U. S. Attorney's Office              Butner, NC 27509
Rm. 800, 310 New Bern Ave.     Email: mbredenberg@bop.gov
Raleigh, NC 27601                     Email: mlockridge@bop.gov
Email: mike.james@usdoj.gov
Email: norman.acker@usdoj.gov
Email: rudy.renfer@usdoj.gov
Email: seth.wood@usdoj.gov


by electronically filing the foregoing with the Clerk of Court on December 7, 2011 using the CM/ECF system which will send notification of such filing to the above:

This the 7th of December, 2011.


                              /s/ *Suzanne Little*
                              SUZANNE LITTLE
                              Assistant Federal Public Defender
                              Office of the Federal Public Defender
                              Attorney for the Respondent
                              150 Fayetteville Street, Suite 450
                              Raleigh, North Carolina 27601
                              Telephone: 919-856-4236
                              Fax: 919-856-4477
                              E-mail: Suzanne_little@fd.org
                              VA State Bar No. 31344
                              LR 57.1 Counsel
                              Appointed